# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | |
|---|---|
| **BRENT STEEPLES,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.:  6:18-cv-1149-MHH** |
| } | |
| **ANDREW SAUL, Commissioner of** } | |
| **the Social Security Administration,**[1] } | |
| } | |
| **Defendant.** } | |

## <u>MEMORANDUM OPINION</u>

Pursuant to 42 U.S.C. § 405(g), Brent Steeples seeks judicial review of a final adverse decision of the Commissioner of Social Security.  After this Court in 6:15-cv-01861-SGC remanded Mr. Steeples's claims for disability insurance benefits and supplemental security income for further proceedings, the ALJ denied Mr. Steeples's disability insurance benefits claim, and Mr. Steeples appealed.  For the reasons stated below, the Court remands the Commissioner's decision.

---

[1] The Court asks the Clerk to please substitute Andrew Saul for Nancy A. Berryhill as the defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 25(d) (When a public officer ceases holding office, that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

# I.  PROCEDURAL HISTORY

In January 2012, Mr. Steeples applied for disability insurance benefits.  (Doc. 6-11, p. 15).  Mr. Steeples alleged that his disability began on August 15, 2011.  On March 16, 2012, the Commissioner denied Mr. Steeples's application.  (Doc. 6-4, p. 5).

In 2013, Mr. Steeples applied for disability, disability insurance benefits, and supplemental security income.  (Doc. 6-4, pp. 6, 7).  Mr. Steeples alleged again that his disability began on August 15, 2011.  (Doc. 6-4, pp. 6, 7).  The Commissioner initially denied Mr. Steeples's application.  (Doc. 6-4, pp. 6, 7).  Mr. Steeples requested a hearing before an Administrative Law Judge (ALJ).  (Doc. 6-3, p. 8). The ALJ issued an unfavorable decision, and the Appeals Council declined Mr. Steeples's request for review.  (Doc. 6-3, pp. 1, 14-22).

Mr. Steeples appealed, and on February 24, 2017, this Court remanded Mr. Steeples's application to the Commissioner for consideration of "new, non-cumulative, [and] temporally relevant evidence" from Mr. Steeples's osteopathic physician, Dr. Ragland.  (Doc. 6-12, pp. 24-34).[2]  The Appeals Council vacated the adverse decision and remanded Mr. Steeples's claims to the same ALJ.  (Doc. 6-3,

---

[2] Dr. Ragland holds a D.O.  (Doc. 6-20, p. 2).  "A doctor of osteopathic medicine (D.O.) is a fully trained and licensed doctor who has attended and graduated from a U.S. osteopathic medical school. . . . The major difference between osteopathic and [other] doctors is that some osteopathic doctors provide manual medicine therapies, such as spinal manipulation or massage therapy, as part of their treatment."  https://www.mayoclinic.org/healthy-lifestyle/consumer-health/expert-answers/osteopathic-medicine/faq-20058168 (last visited Mar. 10, 2020).

p. 22; Doc. 6-12, pp. 34, 37).  By that time, Mr. Steeples had filed a new application for benefits, so the ALJ consolidated Mr. Steeples's old and new claims into one administrative action.  (Doc. 6-12, p. 43; Doc. 6-14, pp. 2, 6).  On March 27, 2018, the ALJ approved Mr. Steeples's application for supplemental security income and denied his application for disability insurance benefits.  (Doc. 6-11, pp. 11-27).

On May 30, 2018, Mr. Steeples asked the Appeals Council to review the ALJ's March 2018 decision, (Doc. 6-11, p. 7), and he requested additional time to prepare his appeal (Doc. 6-11, p. 8).  The Appeals Council explained to Mr. Steeples that it appeared that he waited too long to request additional time.  (Doc. 6-11, p. 3).  The Appeals Council gave Mr. Steeples the opportunity to demonstrate that he had requested additional time within 30 days of the ALJ's decision.  (Doc. 6-11, pp. 3-4).  Mr. Steeples did not respond to the Appeals Council's notice.  Instead, he filed this action in this Court on July 25, 2018, within 120 days of the ALJ's decision.  *See* 42 U.S.C. § 405(g) ("Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow."); (Doc. 6-11, p. 11) (ALJ's decision stating:  "If you think my decision is wrong, you should file your exceptions [with the Appeals Council] within 30 days

or file a new civil action [in federal district court] between the 61st and 121st day after the date of this notice."). Consequently, this action is properly before the Court.

## II. STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r, Soc. Sec. Admin.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r, Soc. Sec. Admin.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In making this evaluation, the Court may not "decide the facts anew, reweigh the evidence" or substitute its judgment for that of the ALJ. *Winschel v. Comm'r, Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If the ALJ's decision is supported by substantial evidence, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III. SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178. In this case, because Mr. Steeples seeks disability insurance benefits, the ALJ also had to determine whether Mr. Steeples was insured when he became disabled. (Doc. 6-11, p. 16).

The ALJ found that Mr. Steeples met the insured status requirements for disability insurance benefits through December 31, 2016. (Doc. 6-11, pp. 16, 18). The ALJ also found that Mr. Steeples had not engaged in substantial gainful activity

since March 17, 2012, the day following the adverse administrative determination on his 2012 application for benefits. (Doc. 6-11, p. 18). The ALJ determined that Mr. Steeples suffered from the following severe impairments from March 17, 2012, through February 27, 2017: hypertensive cardiovascular and peripheral vascular diseases, allergic rhinitis, obesity, and a seizure disorder. (Doc. 6-11, p. 18). The ALJ found that Mr. Steeples's degenerative joint disease became severe effective February 27, 2017. (Doc. 6-11, p. 18).[3] Mr. Steeples suffered from the non-severe impairments of chronic obstructive pulmonary disease, diabetes mellitus with neuropathy, degenerative joint disease (pre-February 27, 2017), and ulcerative colitis. (Doc. 6-11, p. 18).[4]

The ALJ determined that Mr. Steeples became disabled on February 27, 2017. (Doc. 6-11, pp. 20, 26). The ALJ held that before February 27, 2017, Mr. Steeples had the RFC to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c) subject to the following limitations:

> occasional postural maneuvers with the exception of no climbing of
> ropes, ladders, or scaffolds. [Mr. Steeples] would need to avoid

---

[3] "Degenerative joint disease, which is also referred to as osteoarthritis (OA), is a common 'wear and tear' disease that occurs when the cartilage that serves as a cushion in the joints deteriorates. This condition can affect any joint but is most common in knees, hands, hips, and spine." https://www.aapmr.org/about-physiatry/conditions-treatments/pain-neuromuscular-medicine-rehabilitation/degenerative-joint-disease (last visited Mar. 11, 2020).

[4] "Peripheral neuropathy, a result of damage to the nerves outside of the brain and spinal cord (peripheral nerves), often causes weakness, numbness and pain, usually in [a person's] hands and feet. . . . One of the most common causes is diabetes." https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061 (last visited Mar. 13, 2020).

dangerous moving unguarded machinery, unprotected heights, large bodies of water, and uneven terrain.

(Doc. 6-11, p. 20). "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c); 20 C.F.R. § 416.967(c). "If someone can do medium work, . . . he . . . can also do sedentary and light work." 20 C.F.R. § 404.1567(c); 20 C.F.R. § 416.967(c). The ALJ relied on testimony from a vocational expert and concluded that before February 27, 2017, Mr. Steeples could perform his past relevant work as a poultry boner. (Doc. 6-11, pp. 25-26).

Because the ALJ determined that Mr. Steeples was not under a disability within the meaning of the Social Security Act until February 27, 2017, and because December 31, 2016, was Mr. Steeples's date last insured, (Doc. 6-1 p. 27), the ALJ concluded that disability insurance benefits were not available to Mr. Steeples.

## IV. ANALYSIS

Mr. Steeples argues that he is entitled to relief from the ALJ's decision because the ALJ did not properly evaluate his RFC or his reasons for not complying with treatment. (Doc. 11, p. 4). Mr. Steeples also contends that the ALJ committed error when she treated March 17, 2012 as his onset date based on his unsuccessful application for benefits in 2012. (Doc. 11, p. 4). The Court finds that the ALJ properly identified March 17, 2012 as Mr. Steeples's effective onset date, but the Court remands because substantial evidence does not support the ALJ's finding that

Mr. Steeples did not become disabled until February 27, 2017, and because substantial evidence does not support her decision to discount Mr. Steeples's pain testimony.[5]

## Res Judicata

In this action, Mr. Steeples challenges the ALJ's denial of his January 2013 application for disability insurance benefits. (Doc. 6-4, p. 6). In that application, Mr. Steeples asserted that his disability began on August 15, 2011. (Doc. 6-4, p. 6). As discussed above, Mr. Steeples also applied for disability insurance benefits in January 2012. (Doc. 6-11, p. 15). Mr. Steeples states that he asserted an onset date of August 15, 2011, in his 2012 application for disability insurance benefits. (Doc. 11, p. 24).[6]

On March 16, 2012, the Commissioner denied Mr. Steeples's January 2012 application for disability insurance benefits. (Doc. 6-4, p. 5). In September 2012, at Mr. Steeples's request, the ALJ dismissed Mr. Steeples's request for an administrative hearing on the 2012 application. (Doc. 6-4, pp. 2, 5). In the September 2012 order, the ALJ found that Mr. Steeples understood that because he was withdrawing his request for a hearing, the initial March 16, 2012 denial of his request for disability insurance benefits would remain in effect. (Doc. 6-4, p. 5).

---

[5] The Court does not decide the RFC issues.

[6] The Court has not located Mr. Steeples's 2012 application in the administrative record.

The ALJ found that res judicata precluded Mr. Steeples from using August 2011 as his asserted onset date for his 2013 application for disability insurance benefits. The ALJ stated that "res judicata applie[d] through" March 16, 2012, the date of the Commissioner's 2012 adverse decision, so the ALJ would "consider only if [Mr. Steeples] ha[d] been under a disability beginning March 17, 2012." (Doc. 6-11, p. 16).

An ALJ may base a finding on the principle of res judicata if the Commissioner has "made a previous determination or decision . . . on the same facts and on the same issue or issues, and th[e] previous determination or decision has become final by either administrative or judicial action." 20 C.F.R. § 404.957(c)(1). Mr. Steeples argues that "the current [2013] application [does] not involve the same facts and issues as the prior [2012] application" because "this Court remanded the case to the Commissioner, holding that the Appeals Council erred in denying review of new, material, and chronologically [relevant] evidence Steeples submitted to the Council." (Doc. 11, pp. 24-25). But in its February 24, 2017 opinion remanding Mr. Steeples's 2013 application for additional proceedings, this Court accepted the ALJ's res judicata analysis and her finding of a March 17, 2012 onset date. (Doc. 6-12, p. 24, n. 2). That finding became the law of the case. *See Musacchio v. United States*, 136 S. Ct. 709, 716 (2016) (Under the law-of-the-case doctrine, an appellate court declines "to depart from a ruling that it made in a prior appeal in the same

case."); *see also Piambino v. Bailey*, 757 F.2d 1112, 1120 (11th Cir.1985) ("The law of the case doctrine is not an inexorable command, but rather a salutary rule of practice designed to bring an end to litigation, discourage panel [or district court judge] shopping, and ensure the obedience of lower courts.") (internal quotation marks and citations omitted); *United States v. Hall*, 628 Fed. Appx. 681, 684 (11th Cir. 2015) (per curiam) ("The law-of-the-case doctrine is a rule of practice self-imposed by the court and operates to create efficiency, finality, and obedience within the justice system.").

Moreover, the 2017 remand concerned medical records from 2014 that Mr. Steeples presented to the Appeals Council after the ALJ initially denied his 2013 application. The Court's opinion requiring further examination of Mr. Steeples's 2013 application in light of the new medical evidence did not require reassessment of the March 2012 onset date. As Mr. Steeples argues in his reply brief (Doc. 15, p. 10), the Court did note that the new medical evidence "relate[d] to long-standing conditions addressed by the ALJ," (Doc. 6-12, p. 31), but that observation pertained to the Court's finding that the new evidence "relate[d] to the period of time before the ALJ's decision," (Doc. 6-12, p. 31). The finding did not alter the relevant period of time before the ALJ's decision, which the ALJ properly found began on March 17, 2012 because of the res judicata effect of the March 16, 2012 adverse decision

concerning Mr. Steeples's 2012 application for benefits. Consequently, the Court affirms the ALJ's use of an onset date of March 17, 2012.

*The ALJ's Finding that Mr. Steeples Became Disabled in February 2017*

In determining that Mr. Steeples first became disabled in February 2017, the ALJ found that Dr. Ragland's February 2017 treatment notes "corroborate [Mr. Steeples's] allegations of knee pain and dysfunction." (Doc. 6-11, p. 25). The ALJ stated:

> This orthopaedic impairment combined with [Mr. Steeples's] [sic] contributes to his inability to perform routine movement and necessary physical activity [in] a medium work environment and [substantiates a need to] miss[] two or more days of work per month.

(Doc. 6-11, p. 25).[7] The ALJ discounted Mr. Steeples's pre-February 2017 subjective pain testimony partially because she found that Mr. Steeples "chose to allot money to tobacco over his medical need for treatment." (Doc. 6-11, p. 23).

Mr. Steeples contends that the ALJ erred because his evidence establishes that he became disabled before December 31, 2016, his date last insured. To evaluate Mr. Steeples's argument, the Court must examine Ms. Steeples's evidence. The Court has reviewed the entire record, but the Court has focused on the medical information relevant to Mr. Steeples's osteoarthritis and knee impairment.

*The Medical Evidence*

---

[7] It appears the ALJ omitted the word "obesity" from this sentence. (Doc. 11, pp. 10, 12; Doc. 12, p. 7 n.3).

In August, September, three times in October, and November 2011, Mr. Steeples visited Dr. Naidu, a physician with the Cardiovascular Institute of the Shoals based on a referral from Dr. Long, a primary care doctor with Family Medical Associates. (Doc. 6-8, pp. 63, 71, 75, 80, 86, 95; Doc. 6-9, p. 3; Doc. 6-9, p. 97). Mr. Steeples denied joint pain, stiffness, and swelling, muscle cramps, weakness, and aches, loss of strength, arthritis, and limb pain. (Doc. 6-8, pp. 65, 73, 77, 82, 88, 97). After examining Mr. Steeples, Dr. Naidu noted that Mr. Steeples had full extremity strength. (Doc. 6-8, pp. 66, 74, 78, 83, 8, 98). The record of Mr. Steeples's March 2012 visit with Dr. Naidu contains similar information. (Doc. 6-8, pp. 101, 103, 104).

In September 2011, Dr. Naidu referred Mr. Steeples to Dr. Boorgu, a doctor with Shoals Kidney and Hypertension. (Doc. 6-8, p. 110). After examining Mr. Steeples, Dr. Boorgu noted minimal edema in Mr. Steeples's lower extremities but reported no other musculoskeletal abnormalities. (Doc. 6-8, p. 111). Mr. Steeples did not complain of osteoarthritis or knee problems during this visit. (Doc. 6-8, pp. 110, 111).

At the Commissioner's request, Dr. Auxier, a general physician with Auxier Medical Center, examined Mr. Steeples in March 2012. (Doc. 6-9, pp. 59-62). During the evaluation with Dr. Auxier, Mr. Steeples complained of seizure disorders which caused Mr. Steeples to stop working at Pilgrim's Pride as a chicken deboner

in 2011.  (Doc. 6-9, p. 59).  Mr. Steeples reported taking medication unrelated to pain.  (Doc. 6-9, p. 59).  Mr. Steeples denied "generalized joint pain or swelling." (Doc. 6-9, p. 60).  Dr. Auxier noted that Mr. Steeples's range of motion in the knees, gait, station, squatting ability, heel to toe walking, and leg raising tests were normal. (Doc. 6-9, pp. 60-61).  Dr. Auxier opined that Mr. Steeples was temporarily disabled from seizure activity and hypertension.  (Doc. 6-9, p. 62).

In July 2012, Mr. Steeples saw Dr. Shukla, a gastroenterologist with Gastrointestinal Specialists, P.C.  (Doc. 6-9, p. 3).  Dr. Shukla noted that Mr. Steeples had a normal gait and no muscle weakness.  (Doc. 6-9, p. 4).

In March 2013, Mr. Steeples visited a nurse practitioner with Family Care First and complained of blacking out, lower stomach pain, and uncontrolled high blood pressure.  (Doc. 6-9, pp. 8-9).  The nurse practitioner noted that Mr. Steeples had a normal gait and no edema or ataxia.  (Doc. 6-9, p. 9). [8]

At the Commissioner's request, Dr. Harrison, a general physician with Boyde Jerome Harrison MDPC, completed an examination of Mr. Steeples in late March 2013.  (Doc. 6-9, pp. 10, 11, 14).  Mr. Steeples complained of seizures, headaches,

---

[8] "Ataxia is typically defined as the presence of abnormal, uncoordinated movements. This usage describes signs [and] symptoms without reference to specific disease. An unsteady, staggering gait is described as an ataxic gait because walking is uncoordinated and appears to be 'not ordered.'" https://www.hopkinsmedicine.org/neurology_neurosurgery/centers_clinics/ataxia/conditions/ (last visited Mar. 3, 2020).

and tinnitus.  (Doc. 6-9, pp. 11, 12).[9]  Dr. Harrison noted that Mr. Steeples had a history of hypertension and possible ulcerative colitis.  (Doc. 6-9, p. 11).  Based on his examination, Dr. Harrison reported that Mr. Steeples had a normal range of motion in the knees.  (Doc. 6-9, p. 13).  Dr. Harrison opined that Mr. Steeples could "probably perform work related activities if his motivation were adequate."  (Doc. 6-9, p. 14).

In July 2013, Mr. Steeples visited Dr. Ragland, an osteopathic doctor with Family Medical Associates.  (Doc. 6-9, p. 24).  Mr. Steeples told Dr. Ragland that one year had passed since Dr. Long (also with Family Medical Associates as noted above) had treated him.  (Doc. 6-9, p. 24).  Mr. Steeples complained of colitis, abdominal pain, and burning sensations in his back when bending.  (Doc. 6-9, p. 24).  Dr. Ragland's diagnoses included colitis, hypertension, seizure disorder, and low back pain.  (Doc. 6-9, p. 24).  Dr. Ragland prescribed Mobic (one 7.5 mg tablet daily) for Mr. Steeples's back symptoms.  (Doc. 6-9, p. 24).  Mobic (meloxicam) is an NSAID "used to treat pain or inflammation caused by . . . osteoarthritis."  https://www.drugs.com/search.php?searchterm=mobic&sources%5B%5D=   (last visited Mar. 9, 2020).

---

[9] "Tinnitus is the perception of noise or ringing in the ears."  https://www.mayoclinic.org/diseases-conditions/tinnitus/symptoms-causes/syc-20350156 (last visited Mar. 5, 2020).

In September 2013, Mr. Steeples returned to Dr. Ragland and complained of eight months of back and stomach pain. (Doc. 6-16, p. 34). Mr. Steeples stated that he had not picked up the Mobic that Dr. Ragland had prescribed on his last visit. (Doc. 6-16, p. 34). Dr. Ragland's diagnoses included benign hypertension, seizure disorder, back pain, and diabetes. (Doc. 6-16, p. 34).

In March 2014, Mr. Steeples saw Dr. Ragland for medication refills. He complained of pain from a hernia on his abdomen. (Doc. 6-16, p. 30). Dr. Ragland diagnosed benign hypertension, diabetes, a hernia, hyperlipidemia, and abdominal pain. (Doc. 6-16, p. 30). Mr. Steeples's medication list did not include Mobic or other pain relievers. (Doc. 6-16, p. 32).

In May 2014, Mr. Steeples visited Dr. Ragland for medication refills. He also asked her to complete forms for his disability claims. (Doc. 6-16, p. 25). During this visit, Dr. Ragland's diagnoses were benign hypertension, diabetes, hyperlipidemia, seizure disorder, abnormal EKG, and acute COPD. (Doc. 6-16, p. 25). Mr. Steeples's medication list did not include Mobic or other pain relievers. (Doc. 6-16, pp. 25, 26).

Mr. Steeples returned one day later to pick up the mental and physical disability forms that Dr. Ragland had completed. (Doc. 6-16, p. 24; Doc. 6-9, p. 97; Doc. 6-10, pp. 2-3, 5-6; Doc. 6-16, p. 24). According to this May 2014 treatment record, Dr. Ragland's diagnoses of Mr. Steeples included benign hypertension, Type

II diabetes, acute COPD, and joint pain. (Doc. 6-16, p. 24). Dr. Ragland noted in an accompanying cover letter that Mr. Steeples had been a patient of Family Medical Associates for many years. (Doc. 6-9, p. 97). Dr. Ragland reported that Mr. Steeples had left his work as a chicken deboner because he had had two seizures while working on the assembly line, and he "recognized the danger of him handling sharp instruments with him having seizures." (Doc. 6-9, p. 97). Dr. Ragland stated that Mr. Steeples had "a myriad of significant [uncontrolled] medical problems which ma[d]e it impossible for him to hold gainful employment," including breathing and heart problems, hypertension, seizure disorder, obesity, and poor stamina. (Doc. 6-9, p. 97). Dr. Ragland stated that Mr. Steeples could not see specialists or buy medication because of his uninsured status and lack of income, so his medical conditions were not controlled. (Doc. 6-9, p. 97).

In the May 2014 physical functional statement, Dr. Ragland included several narrative clinical findings to supplement her answers to the check-boxes on the form. She reported that Mr. Steeples had back, neck, and hearing problems, poor circulation, leg swelling, dizziness, seizures, "numbness and sharp pain shooting to [the] fingertips," and COPD. (Doc. 6-10, pp. 5-6). Dr. Ragland restricted Mr. Steeples to 20 minutes of standing, 20 yards of walking, and one hour of sitting. (Doc. 6-10, p. 5). Dr. Ragland limited Mr. Steeples to lifting 20 and carrying 10 pounds occasionally. (Doc. 6-10, p. 5). Dr. Ragland stated that she completed the

form based "partly" on Mr. Steeples's subjective complaints and "largely" on her objective examination of Mr. Steeples.  (Doc. 6-10, p. 5).  Dr. Ragland did not discuss osteoarthritis or knee pain in her letter or physical assessment.  (Doc. 6-9, p. 97; Doc. 6-10, pp. 5-6).

In August and December 2014, Mr. Steeples saw Dr. Ragland for medication refills.  (Doc. 6-10, pp. 8, 15).  Dr. Ragland's diagnoses of Mr. Steeples included hypertension, diabetes, hyperlipidemia, colitis, seizure disorder, and obesity.  (Doc. 6-10, pp. 8, 15).  During the August 2014 visit, Dr. Ragland noted that Mr. Steeples could not take tramadol for pain because of his seizure disorder, so she prescribed Norco (5-235 mg).  (Doc. 6-10, pp. 8-9).[10]  Dr. Ragland did not note osteoarthritis or knee pain in these 2014 treatment records.  (Doc. 6-10, pp. 8-10, 15-19).

In 2015, Mr. Steeples visited Dr. Ragland or Ms. Burleson, a certified registered nurse practitioner at Family Medical Associates, primarily for medication refills.  (Doc. 6-17, pp. 35, 38, 48, 53, 59, 63).  During a September 2015 visit, Mr. Steeples complained of pain from a knot on his right knee that began one month earlier.  (Doc. 6-17, p. 48).  Dr. Ragland diagnosed Mr. Steeples with, among other

---

[10] "Tramadol is a narcotic-like pain reliever. . . . used to treat moderate to severe pain."
https://www.drugs.com/tramadol.html last visited Mar. 12, 2020.

things, right knee pain and obesity.  (Doc. 6-17, p. 48).[11]  Dr. Ragland took x-rays of Mr. Steeples's right knee.  (Doc. 6-17, pp. 48-52).

Dr. Ragland noted during the October 2015 visit that she would follow up on the results of Mr. Steeples's right knee x-ray from September.  (Doc. 6-17, p. 39). Dr. Sanders, a radiologist, provided the following x-ray impressions later in October 2015:

1.  Patellar spurring anteriorly.

2.  Equivocal for suprapatellar bursal effusion.

3.  Minimal thinning of the weight-bearing cartilage medially.

(Doc. 6-17, p. 52).[12]

For most of 2015, Mr. Steeples was taking Norco to manage his pain.  (Doc. 6-17, pp. 35, 37, 38, 44, 57, 59, 62, 64).  Mr. Steeples denied painful joints or musculoskeletal weakness during several 2015 visits.  (Doc. 6-17, pp. 36, 39, 49, 54).

---

[11] The other diagnoses of Mr. Steeples in 2015 included back and chronic pain, neuropathy, and arthritis.  (Doc. 6-17, pp. 35, 38, 53, 59).  As Mr. Steeples told Ms. Burleson in July 2015, he attributed his back pain to a slipped disc injury.  (Doc. 6-17, p. 59).

[12] "Bone spurs are bony projections that develop along bone edges. . . . The main cause of bone spurs is the joint damage associated with osteoarthritis. . . . Bone spurs in [the] knee can make it painful to extend and bend [the] leg."  https://www.mayoclinic.org/diseases-conditions/bone-spurs/symptoms-causes/syc-20370212 (last visited Mar. 12, 2020).

"[A] knee effusion is an abnormal amount of fluid in the knee joint." https://www.medicinenet.com/script/main/art.asp?articlekey=7016 (last visited Mar. 12, 2020).

In January, February, and March 2016, Mr. Steeples visited Dr. Ragland for medication refills. (Doc. 6-17, p. 28; Doc. 6-20, pp. 43, 48). Dr. Ragland diagnosed Mr. Steeples with chronic pain. (Doc. 6-17, p. 28; Doc. 6-20, pp. 43, 48). Mr. Steeples denied painful joints or musculoskeletal weakness. (Doc. 6-17, pp. 13, 22, 29). During the January 2016 visit, Mr. Steeples reported that he was out of blood pressure medication. (Doc. 6-17, p. 28). Dr. Ragland noted her belief that Mr. Steeples was not "attempting real medical compliance" and recommended to Mr. Steeples that he inquire about Medicaid or a program for indigent patients that would enable him "to get his meds and possibly become more compliant." (Doc. 6-17, p. 29). Dr. Ragland refilled Mr. Steeples's Norco prescription. (Doc. 6-17, p. 32; Doc. 6-20, pp. 47, 51). Dr. Ragland did not note osteoarthritis or knee pain in these 2016 treatment records. (Doc. 6-17, pp. 12-15, 21-23, 28-31).

During an April 2016 visit with Dr. Ragland, Mr. Steeples complained of "very bad" right knee pain. (Doc. 6-20, pp. 40, 41). Mr. Steeples told Dr. Ragland that his knee was "lock[ing] up." (Doc. 6-20, p. 41). Dr. Ragland's diagnoses included chronic pain and right knee pain. (Doc. 6-20, p. 40). Dr. Ragland observed Mr. Steeples rubbing the inside of his right knee, but she did not detect fluid or heat in that area. (Doc. 6-20, p. 41).

In June 2016, Mr. Steeples visited Dr. Ragland for prescriptions and lab work. (Doc. 6-20, p. 36). Dr. Ragland's diagnoses of Mr. Steeples included chronic pain.

(Doc. 6-20, p. 36).  Mr. Steeples received a Toradol injection on the right gluteus.

(Doc. 6-20, pp. 36, 37).[13]  Dr. Ragland refilled Mr. Steeples's Norco prescription

and recommended that Mr. Steeple restart Mobic for pain management.  (Doc. 6-20,

pp. 36, 37, 39).

In July 2016, Mr. Steeples visited Dr. Ragland to refill his Norco prescription.

(Doc. 6-20, pp. 33, 35).  After examining Mr. Steeples, Dr. Ragland reported that he

had no gross physical changes.  (Doc. 6-20, p. 34).  Dr. Ragland's diagnoses included

pain management and obesity.  (Doc. 6-20, p. 33).

In June 2016, Dr. Ragland completed a medical source statement for Mr.

Steeples.   (Doc. 6-16, pp. 2-3).[14]  Dr. Ragland stated that she was a family

practitioner who began treating Mr. Steeples in July 2013 and saw him three to five

visits yearly.  (Doc. 6-16, p. 2).  Dr. Ragland's diagnoses of Mr. Steeples included

seizure disorder, COPD, diabetes, high blood pressure, neuropathy, arthritis, and

chronic pain.  (Doc. 6-16, p. 2).  Dr. Ragland reported that Mr. Steeples's neuropathy

and back pain prevented him from standing or sitting for long periods.  (Doc. 6-16,

p. 3).  Dr. Ragland opined that Mr. Steeples's conditions precluded him from gainful

employment and would cause him to miss two or more days of work monthly.  (Doc.

---

[13] "Toradol (ketorolac) is a nonsteroidal anti-inflammatory drug (NSAID). . . . used . . . to treat
moderate to severe pain."  https://www.drugs.com/toradol.html (last visited Mar. 9, 2020).

[14] As the ALJ noted in her decision, the handwriting on Dr. Ragland's two medical source
statements is different.  (Doc. 6-11, p. 23; *compare* Doc. 6-16, pp. 2-3, *with* Doc. 6-10, pp. 5-6).

6-16, pp. 2, 3).  Dr. Ragland affirmed that the severity of Mr. Ragland's conditions had existed since Mr. Steeples's alleged onset date, but the form does not specify a date and includes a handwritten question of "What is this?" by the onset date question.  (Doc. 6-16, p. 3).

In July 2016, Mr. Steeples visited Dr. Ragland for a Norco refill.  (Doc. 6-20, pp. 33, 35).  Mr. Steeples denied painful joints or musculoskeletal weakness.  (Doc. 6-20, p. 34).  He was taking Norco and Mobic for pain.  (Doc. 6-20, p. 33).

Mr. Steeples returned to Dr. Ragland in August 2016, complained of right knee pain, and requested an injection.  (Doc. 6-20, pp. 27, 28).  Dr. Ragland's diagnoses of Mr. Steeples's included chronic pain and right knee pain.  (Doc. 6-20, p. 27).  Dr. Ragland administered a trigger point injection into Mr. Steeples's right knee.  (Doc. 6-20, pp. 28-29).[15]  Dr. Ragland refilled Mr. Steeples's Norco prescription.  (Doc. 6-20, p. 31).

At the Commissioner's request, Dr. Harrison completed a functional evaluation of Mr. Steeples in September 2016.  (Doc. 6-18, pp. 2-6).  Mr. Steeples stated that his knee and back prevented him from working.  (Doc. 6-18, p. 3).  Mr. Steeples showed Dr. Harrison the deformity on his (Mr. Steeples's) kneecap, which

---

[15] A trigger point injection "is a procedure used to treat painful areas of muscle that contain trigger points, or knots of muscle that form when muscles do not relax."  https://www.webmd.com/pain-management/guide/trigger-point-injection (last visited Mar. 9, 2020).  "Trigger points are often associated with chronic musculoskeletal disorders, including myofascial pain."  https://arapc.com/physician-consultation/joint-injection-therapy/ (last visited Mar. 9, 2020).

Dr. Harrison described as "mild." (Doc. 6-18, p. 3). Mr. Steeples reported his other diagnoses, including hypertension, COPD, seizures, colitis, and diabetes. Mr. Steeples's medication list included Norco (3.25 mg twice daily) and meloxicam (7.5 mg daily). (Doc. 6-18, p. 4).

Dr. Harrison made the following musculoskeletal findings:

> There is normal [range of motion] in the shoulders, elbows and wrists, hips, knees and ankles. Patient can anteriorly flex to 90 degrees without difficulty. He squat and arose without difficulty. There is a very mild hyperostosis on the medial right patella that I do not think should be painful or involved in his joint. Joint has full [range of motion] without crepitation or instability. Left knee also has full [range of motion] without crepitation or instability. Patient could squat and arise without difficulty. He could stand on his toes and his heels. Lumbar spine has normal extension, side bending and rotation. Cervical spine has normal flexion, extension, side bending and rotation.

(Doc. 6-18, p. 5).[16] Dr. Harrison noted that an x-ray of Mr. Steeples's right knee "reveal[ed] minimal arthritic changes." (Doc. 6-18, p. 5).[17] Dr. Harrison reported that an x-ray of Mr. Steeples's spine showed: "The preservation of the lumbar lordosis. Interspaces are well maintained. There is a mild narrowing at L-4, 5, but otherwise his lumbar spine is [within normal limits]." (Doc. 6-18, p. 6). Dr.

---

[16] Hyperostosis is an "excessive growth or thickening of bone tissue." https://www.merriam-webster.com/dictionary/hyperostosis (last visited Mar. 13, 2020).

[17] Dr. Harrison did not identify the date of the knee and back x-rays that he reviewed, state in his report that he took x-rays, or attach x-rays results to his report. The ALJ stated in her decision that a September 2016 x-ray of Mr. Steeples's right knee showed "minimal degenerative changes." (Doc. 6-11, p. 18). The ALJ based this objective finding on Dr. Harrison's September 2016 consultative report.

Harrison concluded that the examination and x-ray of Mr. Steeples's right knee did not corroborate Mr. Steeples's complaint of osteoarthritis. (Doc. 6-18, p. 6). Dr. Harrison opined that Mr. Steeples "would be able to perform work related activities." (Doc. 6-18, p. 6).

Mr. Steeples saw Dr. Ragland in late September 2016 for a Norco refill. (Doc. 6-20, pp. 23, 26). Dr. Ragland's diagnoses included chronic pain and obesity. (Doc. 6-20, p. 23). Dr. Ragland reported that Mr. Steeples had "no gross physical changes" and no musculoskeletal abnormalities. (Doc. 6-20, p. 24). Mr. Steeples denied painful joints or musculoskeletal weakness. (Doc. 6-20, p. 25).

During an October 2016 visit with Dr. Ragland, Mr. Steeples complained of COPD symptoms. (Doc. 6-20, p. 18). Dr. Ragland's diagnoses included chronic pain and right knee pain. (Doc. 6-20, p. 18). Dr. Ragland's structural examination of Mr. Steeples revealed no abnormalities. (Doc. 6-20, p. 19).[18] Mr. Steeples denied painful joints or musculoskeletal weakness. (Doc. 6-20, p. 20). During a drug screen, Mr. Steeples told a clinic representative that he had run out of Norco during the previous week. (Doc. 6-20, p. 22). Dr. Ragland refilled Mr. Steeples's Norco prescription. (Doc. 6-20, p. 21).

---

[18] A structural examination of a patient's musculoskeletal system generally includes a "[v]isual assessment of posture, spine, muscles, balance, and gait," a "[p]hysical palpation of the back, legs, and arms to assess the quality and motion of tissues and structural make-up," and "[movement of the back, legs, and arms, checking for joint restriction and/or pain." https://www.spine-health.com/treatment/spine-specialists/osteopathic-medical-visit (last visited Mar. 9, 2020).

In December 2016, Mr. Steeples visited Dr. Ragland for medication refills. (Doc. 6-20, p. 15). Dr. Ragland's diagnoses included chronic pain. (Doc. 6-20, p. 15). Dr. Ragland's structural examination of Mr. Steeples revealed no abnormalities. (Doc. 6-20, p. 16). Mr. Steeples denied painful joints or musculoskeletal weakness. (Doc. 6-20, p. 17).

In January 2017, Mr. Steeples visited Dr. Ragland for medication refills. (Doc. 6-20, p. 11). Mr. Steeples denied musculoskeletal weakness and painful joints. (Doc. 6-20, p. 13). Dr. Ragland's diagnoses included chronic pain and arthritis described as "painful spurs of knees." (Doc. 6-20, p. 11). Dr. Ragland noted that Mr. Steeples was not in acute distress and that he exhibited "no gross physical changes." (Doc. 6-20, p. 12). Dr. Ragland reported that Mr. Steeples had normal bilateral extremity motor strength and structural findings. (Doc. 6-20, p. 12).

In February 2017, Mr. Steeples visited Dr. Ragland and complained of bilateral knee pain. (Doc. 6-20, p. 6). During a drug screen, Mr. Steeples told a clinic representative that "he had to take extra [medication] due to increased pain." (Doc. 6-20, p. 10). After examining Mr. Steeples, Dr. Ragland noted that his right knee was tender "but not hot or red." (Doc. 6-20, p. 7) (emphasis omitted). Dr. Ragland detected crepitus in the right knee. (Doc. 6-20, p. 7).[19] Dr. Ragland

---

[19] Crepitus is "[a] clinical sign in medicine that is characterized by a peculiar crackling, crinkly, or grating feeling . . . in the joints. . . . Crepitus in a joint can indicate cartilage wear in the joint

diagnosed Mr. Steeples with right knee pain and noted that the condition was an "acute exacerbation" and "chronic." (Doc. 6-20, p. 6).[20] Dr. Ragland's other diagnoses included chronic pain and osteoarthritis. (Doc. 6-20, p. 6). Dr. Ragland reported that Mr. Steeples had a normal structural examination. (Doc. 6-20, p. 7). Mr. Steeples received a Toradol (60 mg) injection to alleviate pain. (Doc. 6-20, p. 6). Dr. Ragland renewed Mr. Steeples's prescription for Norco (one 5-325 mg tablet twice daily), prescribed Mobic (one 7.5 mg tablet daily), and provided Flector patches for him to apply twice daily. (Doc. 6-20, pp. 6, 9).[21]

*Analysis*

Mr. Steeples challenges the ALJ's onset finding as contrary to the medical evidence and an improper inference without "a legitimate medical basis" under SSR 83-20. (Doc. 11, pp. 10-15); SSR 83-20, 1983 WL 31249, at *3. Citing *Klawinski*

---

space." https://www.medicinenet.com/script/main/art.asp?articlekey=12061 (last visited Mar. 9, 2020).

[20] Acute means "[o]f abrupt onset, in reference to a disease. Acute often also connotes an illness that is of short duration, rapidly progressive, and in need of urgent care. 'Acute' is a measure of the time scale of a disease and is in contrast to 'subacute' and 'chronic.' . . . 'Chronic' indicates [an] indefinite duration or virtually no change.'" https://www.medicinenet.com/script/main/art.asp?articlekey=2133 (last visited Mar. 9, 2020).

[21] "Norco 5/325 (hydrocodone acetaminophen and bitartrate) is an opioid analgesic . . . and pain reliever . . . used to treat moderate to fairly severe pain." https://www.rxlist.com/norco-5-325-side-effects-drug-center.htm (last visited Mar. 9, 2020).

"Flector [transdermal] patches contain diclofenac epolamine, a nonsteroidal anti-inflammatory drug . . . . [and] are used to treat pain caused by minor sprains, strains, or bruising" https://www.drugs.com/flector.html (last visited Mar. 9, 2020).

*v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 772 (11th Cir. 2010), the Commissioner maintains that SSR 83-20 does not apply because "[t]he record contain[s] precise evidence showing when [Mr. Steeple's] condition caused limitations that resulted in an RFC that precluded work." (Doc. 12, p. 10).

The plaintiff in *Klawinski* had a "slowly progressive" knee disorder and argued that the ALJ should have relied on a medical advisor because the ALJ had to determine disability retroactively and "the onset date was ambiguous." *Klawinski*, 391 Fed. Appx. at 775. The Eleventh Circuit Court of Appeals identified two instances in which SSR 83-20 suggests that an ALJ may rely on a medical advisor:

> (1) where it may be possible, based on medical evidence, to "reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination"; and (2) in terms of a malignant neoplastic disease, "[t]o establish onset of disability prior to the time a malignancy is first demonstrated to be inoperable or beyond control by other modes of therapy."

*Klawinski*, 391 Fed. Appx. at 776. The Court of Appeals concluded that "the ALJ did not contravene SSR 83–20 because the ALJ ultimately found that Klawinski was not disabled, and SSR 83–20 only required the ALJ to obtain a medical expert in certain instances to determine a disability onset date after a finding of disability." *Klawinski*, 391 Fed. Appx. at 775.

This Court considered SSR 83-20 in *Santiago v. Berryhill*, No. 4:17-CV-00209-MHH, 2018 WL 3208076 (N.D. Ala. June 29, 2018) and explained:

Citing SSR 83-20, Mr. Santiago contends that if the ALJ was going to reject Ms. Portillo's alleged onset date and identify a different onset date, then the ALJ was required to consult a medical advisor. (*See* Doc. 9, p. 25). The Court disagrees.

Under SSR 83-20, an ALJ "should" consult a medical advisor if the ALJ must infer the disability onset date, and the medical evidence is inadequate. The ALJ has no such obligation if the medical evidence in the administrative record is adequate. SSR 83-20 provides:

> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

SSR 83-20, 1983 WL 31249, at *3.

The Commissioner recently clarified that SSR 83-20 does not require an ALJ to consult a medical expert even if the ALJ must infer a disability onset date. In an emergency message, the Commissioner explained that "SSR 83-20 does not impose a mandatory requirement on an ALJ to call on the services of a medical expert when onset must be inferred. Instead, the decision to call on the services of a medical expert when onset must be inferred is always at the ALJ's discretion." Emergency Message: Clarification of [SSR] 83–20—Titles II and XVI: Onset                                    of                                    Disability, TTPS://secure.ssa.gov/apps10/reference.nsf/links/10172016104408AM, last visited May 25, 2018; *see also* Doc. 10-1.

In any event, the Court finds that this is not a case where the ALJ had "to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination." SSR 83-20, 1983 WL 31249, at *3. Rather, the medical records demonstrate that Ms. Portillo's onset date was after her date last insured. The record contains numerous medical examinations from both before and after Ms. Portillo's date last insured, but as the ALJ found, none of the records that pre-date Ms. Portillo's date last insured established that Ms. Portillo had disabling impairments. Accordingly, the ALJ did not err by failing to consult a medical advisor. *See O'Neal v. Comm'r of Soc. Sec.*, —— Fed. Appx. ——, 2018 WL 2111067 (11th Cir. May 8, 2018).

*Santiago*, 2018 WL 3208076, at *4-5.[22] Consistent with *Santiago*, Mr. Steeples's case does not trigger the application of SSR 83-20 because the ALJ based her disability onset finding on existing medical records.

Substantial evidence still must support the ALJ's reasons for selecting an onset date. Under the circumstances of Mr. Steeples's case, remand is appropriate because of gaps in the ALJ's analysis. The ALJ found that Mr. Steeples's

---

[22] After this Court decided *Santiago*, the Commissioner replaced SSR 83-20 with SSR 18-01p. This replacement ruling states in relevant part:

> At the hearing level of our administrative review process, if the ALJ needs to infer the date that the claimant first met the statutory definition of disability, he or she may call on the services of an ME by soliciting testimony or requesting responses to written interrogatories (i.e., written questions to be answered under oath or penalty of perjury). The decision to call on the services of an ME is always at the ALJ's discretion. Neither the claimant nor his or her representative can require an ALJ to call on the services of an ME to assist in inferring the date that the claimant first met the statutory definition of disability.

SSR 18-01p, 2018 WL 4945639, at *6. SSR 18-01p pertains to applications filed on or after the effective date of October 2, 2018. 2018 WL 4945639, at *7. Consequently, SSR 83-20 applies to Mr. Steeples's disability insurance claim.

osteoarthritis was not severe until Dr. Ragland noted "an acute exacerbation of right knee pain" in February 2017. (Doc. 6-11, p. 18). During this February 2017 visit, Dr. Ragland detected crepitus in Mr. Steeples's right knee and administered a Toradol injection. (Doc. 6-20, pp. 6-7). The ALJ stated that Dr. Ragland's treatment notes predating February 2017 showed "completely normal examinations" with respect to Mr. Steeples's knee. (Doc. 6-11, pp. 22-23). Dr. Ragland's treatment notes do reflect normal musculoskeletal examinations. But as the medical record summary reveals, Dr. Ragland took x-rays of Mr. Steeples's right knee after he reported a knot in September 2015. (Doc. 6-17, pp. 48-52). Dr. Ragland diagnosed Mr. Steeples with right knee pain in September 2015, (Doc. 6-17, p. 48), and arthritis in October 2015, (Doc. 6-17, p. 38). Dr. Ragland received x-ray results from Dr. Sanders later in October 2015 which confirmed spurring on Mr. Steeples's right kneecap and minimal thinning of the cartilage on the medial side of Mr. Steeples's right knee. (Doc. 6-17, p. 52). Dr. Sanders could not confirm whether Mr. Steeples had fluid on his right knee joint. (Doc. 6-17, p. 52).

In August 2016, Dr. Ragland gave Mr. Steeples a trigger point injection in the right knee. (Doc. 6-20, pp. 28-29). Dr. Ragland noted in January 2017 that "painful spurs of [the] knees" were responsible for Mr. Steeples's arthritis. (Doc. 6-20, p. 11); *see* SSR 02-1p, 2002 WL 34686281, at *3 ("[Obesity] commonly leads to, and often complicates, chronic diseases of the . . . musculoskeletal body system[,

including] osteoarthritis.").  These pre-February 2017 treatment records are consistent with Mr. Steeples's reports of knee pain and with his obesity.  *See* SSR02-01p, 2002 WL 34686281, at *6 ("The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.").[23]

The ALJ found that Dr. Ragland's treatment notes from October 2017 "show[ed] that [Mr. Steeples] had palpable bony [callus] deposition in the knees and that [Mr. Steeples] was having some difficulty arising from a seated position."  (Doc. 6-11, p. 23; 6-19, p. 21).[24]  The ALJ stated that these notes came "well after the established onset date."  (Doc. 6-11, p. 23).  In finding that Mr. Steeples did not have a severe knee condition before February 27, 2017, the ALJ relied on Dr. Harrison's 2016 impression that an x-ray of Mr. Steeples's knee showed minimal arthritic changes.  (Doc. 6-11, p. 18; Doc. 6-18, p. 5).  Given Mr. Steeples's level II obesity from 2014 to 2017 and the degenerative nature of osteoporosis, the date of the x-

---

[23] As mentioned above, the ALJ found that Mr. Steeples's obesity was a severe impairment as of March 2012.  (Doc. 6-11, p. 18).

[24] A bony callus is "[t]he hard new bone substance that forms in an area of bone fracture. Bony callus is part of the bone repair process." https://www.medicinenet.com/script/main/art.asp?articlekey=2579 (last visited Mar. 20, 2020).

rays that Dr. Harrison reviewed in 2016 is critical information.[25]  The Court cannot tell if Dr. Harrison took new knee x-rays in September 2016 or if Dr. Harrison simply reviewed Dr. Sanders's October 2015 radiological report.   Because that date is uncertain, because medical records pre-dating February 27, 2017, corroborate Mr. Steeples's knee pain, and because Mr. Steeples's obesity impacts his knee pain and the related limitations, the Court cannot determine whether substantial evidence supports the ALJ's onset date finding.

Mr. Steeples contends that the ALJ's reliance on evidence of medical non-compliance to determine his severe conditions and to discount his subjective pain testimony is contrary to this Court's remand decision.  (Doc. 11, pp. 18, 20).  The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through his own testimony of pain or other subjective symptoms."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r, Soc. Sec. Admin.*, 771 Fed. Appx. 913, 917 (11th Cir. 2019).  When relying on subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged

---

[25] Mr. Steeples's body mass index (BMI) was 36.12 in December 2014, (Doc. 6-10, pp. 15, 18), 35.01 in April 2016, (Doc. 6-20, p. 40), 36.01 in August 2016, (Doc. 6-20, pp. 27, 29), and 35.29 in February 2017, (Doc. 6-20, pp. 6, 7).  "Level II [obesity] includes BMIs of 35.0-39.9."  SSR 02-01p, 2002 WL 34686281, at *2.

[symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223); *Chatham v. Comm'r, Soc. Sec. Admin.*, 764 Fed. Appx. 864, 868 (11th Cir. Apr. 18, 2019) (citing *Wilson*). If the ALJ does not demonstrate "proper application of the three-part standard[,]" reversal is appropriate. *McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r, Soc. Sec. Admin.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). If an ALJ rejects a claimant's subjective testimony, then the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *Coley*, 771 Fed. Appx. at 918. The district court must accept the claimant's testimony, as a matter of law, if the ALJ inadequately discredits it. *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r, Soc. Sec. Admin.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*).

When credibility is at issue, the provisions of Social Security Regulation 16-3p apply. SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4. Concerning the ALJ's analysis when discrediting a claimant's subjective symptoms, SSR 16-3p states:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough . . . simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *10.

In evaluating a claimant's reported symptoms, an ALJ must consider:

(i) [the claimant's] daily activities;

(ii) [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(iii) [p]recipitating and aggravating factors;

(iv) [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

(v) [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

(vi) [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r, Soc. Sec. Admin.*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

The ALJ discounted Mr. Steeples's subjective reports of knee limitations that predated February 27, 2017. (Doc. 6-11, pp. 18, 21-22). The ALJ found that Mr. Steeples's medical records showed "no more than minimal work-related limitations" and "fail[ed] to document a sufficient objective basis to accept [his] allegations resulting in functional limitations before February 27, 2017." (Doc. 6-11, pp. 18, 22). The ALJ relied on evidence of Mr. Steeples's non-compliance with treatment to support her pain assessment. (Doc. 6-11, pp. 23-24).

The ALJ's reliance on Mr. Steeples's non-compliance with medical treatment is inadequate to discount his knee pain. In her first decision, the ALJ found that Mr. Steeples did not take his diabetes and seizure medication as prescribed and continued to smoke. (Doc. 6-3, pp. 17, 19, 20). The ALJ relied on Mr. Steeples's medical non-

compliance when she formulated his RFC. (Doc. 6-3, p. 20). The Court remanded Mr. Steeples's case because the ALJ did not investigate the possible reasons for his non-compliance, and one of Dr. Ragland's treatment records corroborated Mr. Steeples's testimony that he could not afford medical treatment. (Doc. 6-12, pp. 33-34). Because the record lacked evidence of willfulness, the Court found that the ALJ could not rely Mr. Steeples's failure to quit smoking as evidence of medical non-compliance. (Doc. 6-12, p. 33 n.4).

The ALJ acknowledged the Court's points in her second decision. (Doc. 6-11, p. 23). Still, the ALJ found that:

> [Mr. Steeples's] continuing to smoke is a factor when assessing the effect of poverty on compliance with medical treatment and the consistency of [his] contention that he does not have funds for medical treatment. Because [Mr. Steeples] continues to choose to spend money on tobacco, albeit he asserts that this is money from friends and he has been trying to quit smoking, the claimant has shown that he has chosen to allot money to tobacco over his medical need for treatment.

(Doc. 6-11, p. 24). Concerning medical non-compliance, the ALJ also stated that:

> [Mr. Steeples's] testimony that he does not know . . . about "charity care" is not consistent with a statement of Dr. Ragland of February 7, 2018, when she reported: "With the assistance of indigent programs from pharmaceutical companies and 'gratis' medical care we have been able to get [Mr. Steeples's] chronic disorders better controlled."

(Doc. 6-11, p. 24). For the purpose of this opinion, the Court finds that the ALJ's reasons for discounting Mr. Steeples's limitations caused by diabetes and seizures due to his medical non-compliance are adequate.

But the ALJ did not appropriately rely on that evidence to discount Mr. Steeples's pain which, as the ALJ acknowledged, Mr. Steeples's level II obesity exacerbated. Dr. Ragland diagnosed Mr. Steeples with chronic pain, refilled his Norco prescription regularly, and prescribed Mobic periodically before February 27, 2017. Mr. Steeples received a Toradol injection and a right-knee trigger point injection before February 27, 2017. (Doc. 6-20, pp. 36, 37; Doc. 6-20, pp. 28-29). This evidence undermines the ALJ's finding that the record lacked corroborating evidence of Mr. Steeples's degenerative pain before February 27, 2017. (Doc. 6-11, p. 25). Therefore, the ALJ's reliance on Mr. Steeples's non-compliance with recommended diabetes and seizure treatment to discount his knee and osteoarthritis pain at steps two and four is not supported by substantial evidence.

## V. CONCLUSION

The Court remands the Commissioner's decision for further development of Mr. Steeples's onset date.

The recent General Order Regarding Court Operations During the Public Health Emergency Caused by the COVID-19 Virus (N.D. Ala. Mar. 17, 2020) does not affect the deadline to challenge a final order or judgment on appeal. *See* https://www.alnd.uscourts.gov/general-order-regarding-court-operations-during-public-health-emergency-caused-covid-19-virus, p. 2, ¶ 7. The parties are reminded that under Rule 4(a)(5) of the Federal Rules of Appellate Procedure, a party may

request an extension of time for a notice of appeal.  In addition, pursuant to Rule 4(a)(6), a party may ask a district court to reopen the time to file a notice of appeal for 14 days.  Parties are advised to study these rules carefully if exigent circumstances created by the COVID-19 Public Health Emergency require motions under FRAP 4(a)(5) or 4(a)(6).

**DONE** this 30th day of March 2020.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE